IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| GREGORY A. FARLEY, | ) | CASE NO. 1:18-CV-1766 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Gregory Farley ("Farley") seeks judicial review of the final decision of

Defendant Commissioner of Social Security ("Commissioner") denying his application for

Disability Insurance Benefits ("DIB").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C.

§ 405(g).  This case is before the undersigned Magistrate Judge pursuant to the consent of the

parties.  Doc. 13.

As set forth below, the ALJ's decision with respect to Farley's daily activities is not

supported by the evidence, and, with respect to Farley's treatment history, the ALJ's decision is

not sufficiently explained, which prevents the Court from conducting a meaningful review.

Accordingly, the Commissioner's decision is **REVERSED and REMANDED** for proceedings

consistent with this opinion.

## I. Procedural History

Farley filed an application for DIB in March 2012, alleging a disability onset date of

January 1, 2011.  Tr. 223, 232.  He alleged disability based on the following: arthritis, herniated

discs, disc displacement, spondylosis, and degenerative disc disease.  Tr. 252.  After denials by

the state agency initially (Tr. 159) and on reconsideration (Tr. 176), Farley requested an

administrative hearing (Tr. 104).  A hearing was held before an Administrative Law Judge ("ALJ") in August 2013 and the ALJ issued a decision determining that Farley was not disabled. Tr. 63, 48-58.  The Appeals Council denied Farley's request for review and Farley appealed to the federal district court, which remanded the case for further consideration of VE testimony and the treating physician opinion.  Tr. 674-696.

Upon remand, the ALJ held a second hearing, on May 17, 2017.  Tr. 610-634.  In her July 25, 2017, decision (Tr. 588-603), the ALJ determined that there are jobs that exist in significant numbers in the national economy that Farley can perform, i.e. he is not disabled.  Tr. 602-603. Farley requested review of the ALJ's decision by the Appeals Council (Tr. 722) and, on May 31, 2018, the Appeals Council denied review, making the ALJ's July 25, 2017, decision the final decision of the Commissioner.  Tr. 577-581.

## II. Evidence

### A. Personal and Vocational Evidence

Farley was born in 1961 and was 53 years old on his date last insured, March 31, 2014. Tr. 601.  He has a high school education as well as vocational training as a tool and die maker; he is a certified journeyman.  Tr. 68.  He last worked in 2009 as a tool and die maker.  Tr. 68.

### B. Relevant Medical Evidence[1]

In March 2011, Farley had an MRI of his lumbar spine due to his complaints of low back pain and leg weakness.  Tr. 341.  The MRI showed "minimal" to "very minimal" disc bulging at several levels causing no significant compression other than "slight anterior thecal sac flattening" at one level.  Tr. 341.

On October 27, Farley saw orthopedic surgeon Jerold Gurley, M.D., for complaints of

---

[1] Farley only challenges the ALJ's decision with respect to his spinal impairments.  Thus, only the evidence related to these impairments are summarized and discussed herein.

2

pain in his neck, shoulders, and back. Tr. 354. He had had fusion surgery at the T6-7 level nine years prior. Tr. 354. Dr. Gurley reviewed Farley's follow-up x-rays and remarked that the spinal instrumentation remained in good position and that the fusion was consolidating nicely, with "only very mild early spondolytic features in the adjacent C5-6 segment." Tr. 354. Dr. Gurley diagnosed Farley with lumbar spondylosis L5-S1, chronic intermittent lumbago/lumbar radiculopathy, mild adjacent segment spondylosis at C6-7, chronic residual cervicalgia, and post laminectomy syndrome, cervical. Tr. 354. Dr. Gurley ordered an MRI of Farley's cervical spine prior to referring him to pain management. Tr. 355.

On November 30, 2011, Farley returned to Dr. Gurley, who went over his neck MRI. Tr. 352. The MRI showed changes resulting in early bilateral foraminal stenosis. Tr. 352. He also had a small, contained, non-compressive central herniation at C3-4. Tr. 352. Dr. Gurley was prepared to refer him to pain management, but Farley told him, for the first time, that he had been stabbed in his thoracic spine with a screwdriver when he was 14 years old and had been unable to walk for days at that time. Tr. 352. Accordingly, Dr. Gurley ordered a thoracic MRI. Tr. 352.

Farley returned to Dr. Gurley on December 28 to discuss his MRI results. Tr. 351. Dr. Gurley concluded that the MRI showed disc degeneration and loss of disc height but no evidence of any significant stenotic or neurocompressive pathology. Tr. 351. He recommended observation, symptomatic treatment, and maximizing nonoperative treatment before considering further surgery. Tr. 351. He referred Farley to a pain specialist and a rheumatologist to rule out an inflammatory disorder. Tr. 351.

On January 17, 2012, Farley saw pain management specialist Abdallah Kabbara, M.D., for back pain for the last 20 years. Tr. 349. Upon exam, Farley had an antalgic gait and some

limited range of motion in his cervical spine. Tr. 349-350. Otherwise, Farley had a normal range of motion in his low back, his back was not tender, he had normal sensation and reflexes, normal power in his arms and legs, a negative Hoffman sign, and he was able to stand on toes and heels without difficulty. Tr. 349-350. Dr. Kabbara commented that the extent of Farley's disease made intervention challenging due to the multi-level nature of his condition. Tr. 350. He prescribed Methadone and Gabapentin and recommended a trial thoracic epidural steroid injection. Tr. 350. Eight days later, he administered a steroid injection in Farley's mid-back. Tr. 348.

On February 10, 2012, Farley reported to Dr. Kabbara that he had no significant improvement from the injection but had relief with medication. Tr. 346. Upon exam, he had an antalgic gait but otherwise normal findings, including power "at baseline" in his arms and legs. Tr. 346. Dr. Kabbara increased the dose of both medications and stated that he would not administer further injections. Tr. 346-347.

On March 9, 2012, Farley returned to Dr. Kabbara and described some improvement with medications and no side effects. Tr. 345. His physical exam findings were unchanged from his prior visit. Tr. 345. Dr. Kabbara continued his methadone and increased his gabapentin. Tr. 345. Dr. Kabbara remarked, "I do not believe that the patient is a candidate to continue working for long hours." Tr. 345.

On April 5, 2012, Farley saw Dr. Kabbara and described his condition as stable on medication and rated his pain 5/10, which represented an improvement. Tr. 370. He expressed interest in seeking disability benefits and "confirmed that he is unable to perform his duty at work." Tr. 370. Upon exam, he had an antalgic gait and otherwise normal findings. Tr. 370. Dr. Kabbara made no medication changes, refilled his prescriptions for four months, and stated

that he believed that Farley had "significant extensive disease which supports him to be placed on disability." Tr. 370.

On September 4, 2012, Farley returned to Dr. Kabbara for a medication refill, denying medication side effects and reporting that, on medication, his pain was tolerable. Tr. 472. Upon exam, Dr. Kabbara noted no abnormalities and observed him to be "[a]mbulating at baseline without any neurological deficit apparent." Doc. 472. Dr. Kabbara continued his current medications for three months and concluded that Farley was currently maintained on medication with reasonable results. Tr. 472.

On December 11, 2012, Farley returned to Dr. Kabbara and reported exacerbations of pain recently that had been treated with steroids, which were beneficial. Tr. 909. Farley requested Dr. Kabbara adjust his Gabapentin and Dr. Kabbara started Lyrica instead and continued his Methadone. Tr. 909.

In January 2013, Farley saw Dr. Kabbara and reported that, for the majority of the time, his new medication regime kept his pain well under control, but he had an exacerbation of his pain when he was cleaning his garage and lifted a few items that he was not supposed to lift. Tr. 911. His exam findings were normal. Tr. 911. Dr. Kabbara recommended thoracic/upper lumbar injections, which Farley had three times in January and February. Tr. 911, 913, 915, 916.

On April 16, 2013, Farley saw neurosurgeon R. Goel, M.D., for a second opinion for back surgery. Tr. 529. He reported dragging his right foot for several months, lower back pain that radiates to his right leg, and having to sit in a flexed position due to feeling a sharp pain in the upper part of his lumbar spine. Tr. 529. His three injections helped with back pain for a few weeks but did not help his leg pain. Tr. 529. Upon exam, he had normal findings and Dr. Goel ordered a lumbar MRI. Tr. 529.

On April 25, 2013, Farley told Dr. Kabbara that he believed his condition was getting worse; the methadone was "not holding him up as good as it used to be in the past." Tr. 918. His back pain was 10/10 and some of it radiated down his right leg. Tr. 918. Upon exam, he looked to be in some distress. Tr. 918. He had minimal weakness in his right leg and he ambulated without assistance. Tr. 918. Dr. Kabbara increased his methadone, continued his Lyrica, and advised he follow up with Dr. Goel to discuss the need for surgical intervention. Tr. 918.

On May 7, Farley followed up with Dr. Goel. Tr. 530. His MRI showed epidural lipomatosis[2] in his lower back causing lumbar stenosis at L4 and L5 and compression on the thecal sac. Tr. 530. Dr. Goel described two options: surgery or weight loss. Tr. 530. Because Farley had gained weight due to having been on steroids to treat his sarcoidosis (and was still on steroids), Dr. Goel opined that weight loss seemed unlikely and the only course of treatment was surgery to decompress the thecal sac and remove the epidural fat. Tr. 530.

On May 22, Farley saw Dr. Kabbara and reported the increased methadone was helping his pain, but he did not believe that the methadone dose he took in the morning would hold his pain until the next dose 12 hours later and requested additional medication. Tr. 920. Upon exam, his lower extremity power and range of motion was baseline. Tr. 920. Dr. Kabbara increased his methadone and stated that he would reevaluate him after his upcoming surgery with Dr. Goel on May 30. Tr. 920.

On June 8, 2013, shortly after his surgery, Farley went to the emergency room complaining of back pain, nausea, and fever. Tr. 893. His exam findings were normal except for decreased strength in his legs, which the doctor stated was "most likely due to poor effort." Tr.

[2] Lipomatosis is abnormal accumulations of fat in tissue. *See* Dorland's Illustrated Medical Dictionary, 32nd Edition, 2012, at 1063.

895. He was treated for pain and released with a diagnosis of post-operative lumbar pain. Tr. 897. On June 11, Farley followed up with Dr. Goel and stated that he was "very pleased with the results" of the surgery. Tr. 538. He had 80% relief from leg pain, although his back pain persisted, and his pain level was 2-3/10. Tr. 538. His incision cite was healthy. Tr. 538. He reported some neck pain and hand numbness and Dr. Goel ordered x-rays and referred him to one of his colleagues for "guidance in physical therapy for the neck." Tr. 538, 868. The cervical spine x-ray showed degenerative and postsurgical changes. Tr. 539.

On June 21, 2013, Farley saw Dr. Kabbara and reported that his pain was under reasonable control and he was able to reduce the methadone. Tr. 922. Upon exam, he ambulated with an antalgic gait. Tr. 922.

On September 23, 2013, Farley reported to Dr. Kabbara that his current medication regimen seemed to have his pain well under control: his neck pain was 2-3/10, his back pain was 5/10, and he noticed some tingling in his right arm to his fingers. Tr. 924. Upon exam, he had normal findings and ambulated without difficulty at baseline. Tr. 924. Dr. Kabbara continued his medications and recommended an EMG/nerve conduction study of his right arm. Tr. 924-925.

On October 29, 2013, Farley saw Dr. Goel stating that his leg pain had returned. Tr. 868. Dr. Goel recommended back and abdominal strengthening and stretching exercises, a walking program, wearing a back brace for 10 hours a day, use of ice and heat, and using a lumbar support cushion when sitting or driving. Tr. 868.

On January 24, 2014, Farley saw Dr. Kabbara and reported that his pain was 2-3/10 with the medication and 7-8/10 without, explaining that he believed the methadone worked for 5-6 hours only. Tr. 926. He still had tingling in his right arm but had been unable to schedule an

EMG. Tr. 926. Dr. Kabbara stated that an MRI taken on January 10 showed status-post laminectomy at L4-L5, L5-S1 without residual measurable canal stenosis, no abnormal enhancement, no evidence of bulging or herniated disc, and bilateral hypertrophy. Tr. 926. His physical exam findings were normal and he ambulated at baseline. Tr. 926. Dr. Kabbara increased Farley's methadone and explained, "even though [Farley] did undergo the laminectomy in the lumbar spine area, he still has multilevel disk bulges in the cervical and the lumbar spine area that could explain the persistent pain in his lower extremities and could also explain the pain and tingling going down his right upper extremity." Tr. 927. He recommended titration of medication and a trial of spinal cord stimulation if he was not a candidate for additional surgery. Tr. 927.

On February 28, 2014, Farley reported continued benefit from his medication and denied any side effects. Tr. 928. His physical exam findings remained unchanged and Dr. Kabbara continued his medications. Tr. 928.

**Evidence after date last insured, March 31, 2014**:

On April 5, 2014, Farley went to the emergency room for gastrointestinal symptoms, which he attributed to his withdrawal from Lyrica, which he had stopped taking. Tr. 898. Upon exam, he had a full range of motion in his extremities, intact sensation, a normal gait, and intact motor function. Tr. 900.

On June 4, 2014, Farley followed up with Dr. Kabbara, reporting medication effectiveness and no new complaints. Tr. 930. On September 3, 2014, Farley reported that his medication was effective; the majority of the time his pain was well under control. Tr. 932. His exam findings were baseline at each of these visits. Tr. 930, 932.

On December 1, 2014, Farley saw Dr. Kabbara and complained that his methadone was not working as it had before. Tr. 934. He reported severe pain, 8/10, in his lower lumbar spine radiating down to his leg. Tr. 934. Upon exam, he had "minimal weakness" in his right leg compared to his left, but he "continue[d] to ambulate without assistance." Tr. 934. Dr. Kabbara scheduled a lumbar steroid injection, which he performed on December 16. Tr. 934, 936.

On March 20, 2015, Farley went to the emergency room for chest pain. Tr. 903. He reported chronic back pain and denied pain in his extremities and neck. Tr. 904. Upon exam, he had a full range of motion in his extremities, intact motor function and intact sensation, and no tenderness. Tr. 905.

On June 25, 2015, Dr. Kabbara gave Farley a cervical spine epidural steroid injection. Tr. 938-939.

On February 23 and March 15, 2016, Dr. Kabbara gave Farley a lumbar spine epidural steroid injection. Tr. 940, 941.

On April 12, 2016, Dr. Kabbara gave Farley a lumbar diagnostic nerve branch block. Tr. 942. On April 26, Dr. Kabbara performed a lumbar radiofrequency ablation. Tr. 943.

On May 19, Farley told Dr. Kabbara that he did not have significant improvement from the radiofrequency ablation. Tr. 944. Upon exam, he ambulated "at baseline" and Dr. Kabbara added Percocet for breakthrough pain and ordered an MRI and EMG. Tr. 944-945. A June EMG and nerve conduction study of Farley's legs showed evidence consistent with chronic mild radiculopathy at two levels with no active denervation. Tr. 1032.

On July 6, 2016, Farley saw Dr. Goel complaining of right arm pain and weakness. Tr. 1036. Upon exam, he had a normal range of motion, a normal gait, intact sensation and reflexes, normal muscle tone, and decreased (4+ out of 5) right-arm strength. Tr. 1036. Dr. Goel

diagnosed cervical radiculopathy, failure of conservative treatment option, and ordered a neck MRI, which showed postoperative changes from C6-C7 anterior cervical discectomy and fusion; no significant spinal canal stenosis at any level; and moderate to marked neural foraminal narrowing at multiple levels.  Tr. 1036, 1058-1059.

On July 11, Farley returned to Dr. Goel, who described his MRI as showing some adjacent segment disease with mild to moderate foraminal stenosis.  Tr. 1033.  Farley denied any weakness.  Tr. 1033.  Upon exam, he had full strength in all extremities and a normal gait.  Tr. 1034.  Dr. Goel assessed cervical radiculopathy and recommended Farley stretch his neck muscles five times a day, cervical epidural blocks, and physical therapy.  Tr. 1034.

On September 8 and October 25, 2016, Dr. Kabbara gave Farley a cervical spine epidural steroid injection.  Tr. 946, 947.

### C. Medical Opinion Evidence

#### 1. Treating Source

On March 9, 2012, Dr. Kabbara completed a Functional Capacity Questionnaire on behalf of Farley.  Tr. 343.  Dr. Kabbara opined that, during an eight-hour workday, Farley could sit two hours, stand and/or walk two hours, lift and carry up to twenty pounds rarely and less than ten pounds occasionally, occasionally grasp or finger, rarely handle, and never stoop (bend) or crouch.  Tr. 343.  He would experience pain severe enough to occasionally interfere with attention and concentration needed to perform even simple work tasks and he likely would be absent from work more than four days per month.  Tr. 343.  When asked to identify Farley's signs and symptoms, Dr. Kabbara circled "impaired sleep" and "reduced range of motion."  Tr. 343.

#### 2. State Agency Reviewing Physicians

On May 31, 2012, state-agency reviewing physician William Bolz, M.D., reviewed Farley's record and opined that he had the following limitations: stand/walk six hours; sit six hours; lift/carry ten pounds occasionally and 20 pounds frequently; and occasionally stoop and crouch. Tr. 155-156. On December 17, 2012, state-agency reviewing physician Gary Hinzman, M.D., adopted Dr. Bolz's opinions and added environmental limitations. Tr. 170-172.

### D. Testimonial Evidence

#### 1. Farley's Testimony

Farley was represented by counsel and testified at both administrative hearings; additionally, his wife testified at the second hearing.

First hearing, August 29, 2013: When asked why he was unable to work, Farley stated that he has protrusion in all of the discs in his back, he had previously had neck surgery and recently had lower back surgery, he "can't hardly walk," his right, dominant arm is numb, and, if he does a limited amount of standing, sitting and walking, he usually has to lie down to relieve the pain. Tr. 77.

Farley testified that he lives in a one-story house with his wife. Tr. 81. When asked about his right arm, Farley stated that he gets a prickly feeling from his shoulder to the tips of his fingers. Tr. 77. He sometimes has problems getting dressed or holding a utensil; his hand will shake and he drops things. Tr. 77. His wife helps him take showers. Tr. 78. He can pick a coin off a table but sometimes when he writes he can't feel the pen touching the page or his fingers. Tr. 78. He has problems walking; if he goes to the grocery store with his wife he has to ride in a cart at the store. Tr. 79. At the hearing, he walked "up here" from "out front and up the stairs" and he was in pain by the time he got to the hearing room. Tr. 79. He takes medication for pain and it helps, but it also causes a cloudy feeling from the high he gets from it. Tr. 79. At the time

of the hearing, Farley was taking methadone and Lyrica. Tr. 84. He doesn't drive a car right after he takes his medication—he waits a couple of hours at least—but he is able to drive a car. Tr. 79. He drives short trips, like to the grocery store or doctor appointments. Tr. 80. He goes to church. Tr. 80. He does a little bit of housework and it takes him longer to do it. Tr. 80. He can do the dishes, wipe off counters and some laundry (he has a hard time folding because of shoulder and arm movement), but he cannot sweep or mop because of his back. Tr. 80, 81. His wife performs these chores as well as mowing the lawn; he is unable to do any work outside. Tr. 80.

Farley spends his time during the day doing a bit of housekeeping when he can. Tr. 81. He spends a lot of time lying down on the sofa watching television. Tr. 81. He goes to doctor appointments a couple of times a month. Tr. 81. He takes his wife to the grocery store. Tr. 81. He used to enjoy woodworking and golfing but cannot do these things anymore because of his back. Tr. 82. He has to wear slip-on shoes because he can't bend over to tie his shoes. Tr. 78. Sometimes, maybe once a year, he and his wife will visit her relatives in West Virginia or Pennsylvania. Tr. 82.

Farley had a laminectomy three months prior to the hearing. Tr. 85. The other possible way to address his back problem other than having the surgery was to lose weight, but Farley was unable to lose weight because he had been on steroids for his sarcoidosis. Tr. 85-86.

When asked if he could perform his past work, Farley answered that he would not last an hour. Tr. 86. He could work a less strenuous job for a couple of hours at a time, but then he would have to lie down. Tr. 87. The amount of time he would have to spend lying down would depend on how long he has been up; after the hearing, where he had been standing, walking or sitting for 3-4 hours, Farley estimated he would have to lie down for 3-4 hours. Tr. 87.

Second hearing, May 17, 2017:  Farley confirmed that his statement at the last hearing—he could sit, stand and walk for 3-4 hours then would need to lie down for 3-4 hours—has continued to be the case.  Tr. 621.  He is still on pain medications; currently, he took hydromorphone.  Tr. 621.  The ALJ confirmed that, after the prior hearing, Dr. Goel corrected a treatment note to reflect that Farley indicated that his laminectomy provided 80% relief of leg pain that lasted months; the treatment note had read that Farley indicated he experienced 80% of back and leg pain relief.  Tr. 621.  When asked what about the surgery provided relief, Farley explained that Dr. Goel scraped the fat tissue off the nerves in his lower back.  Tr. 622.  The procedure caused his feet to go "somewhat continually numb" and did not help his back pain at all.  Tr. 622.

Next, Farley's wife testified.  Tr. 623.  She confirmed that Farley is unable to do yard work, take out the trash, carry heavy objects, or do most of the housework.  Tr. 624.  He can load the top rack of the dishwasher and wipe kitchen counters, but then he has to sit down for a few minutes to rest his back.  Tr. 624.  He lies down most of the day.  Tr. 624.  If he goes out, he is lying down for 2-3 days to rest his back afterwards.  Tr. 625.  This has been going on for 4-5 years.  Tr. 625.  She has to help him wash and he has fallen numerous times.  Tr. 625.

## 2. Vocational Expert's Testimony

A Vocational Expert ("VE") also testified at the hearing.  Tr. 627-631.  The ALJ referenced Farley's past work as a tool and die maker, Tr. 620, 627, and asked the VE to determine whether a hypothetical individual of Farley's age, education and work experience could perform his past work or any other work if that person had the limitations assessed in the ALJ's RFC determination, and the VE answered that such an individual could not perform his

past work but could perform other jobs in the national economy such as assembler of small products, electronics worker, and assembler of printed products.  Tr. 628.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.    If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[3] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the vocational factors to

perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In her July 25, 2017, decision, the ALJ made the following findings:

1. The claimant last met the insured status requirements of the Social Security Act on March 31, 2014.  Tr. 591.

2. Through March 31, 2004, the claimant engaged in substantial gainful activity during the following periods: January 1, 2007 through December 31, 2007.  Tr. 591.

3. There has been a continuous 12-month period(s) during which the claimant did not engage in substantial gainful activity.  The remaining findings address the period(s) the claimant did not engage in substantial gainful activity.  Tr. 591.

4. Through the date last insured, the claimant had the following severe impairments: degenerative disc disease, osteoarthritis and allied disorders, sarcoidosis, coronary artery disease, and obstructive and central apnea.  Tr. 591.

5. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  Tr. 591.

6. Through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b), except the claimant could climb ramps and stairs frequently, and climb ladders, ropes, or scaffolds never.  He could frequently balance, and occasionally stoop, kneel, crouch, and crawl.  The claimant had

---

[3] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 *et seq*.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 *et seq*., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

to avoid exposure to extremes of cold and heat.  He had to avoid exposure to humidity.  The claimant had to avoid all exposure to fumes, odors, dusts, gasses, and poor ventilation.  He had to avoid all exposure to hazards such as industrial machinery and unprotected heights.  Tr. 592.

7.  Through the date last insured, the claimant was unable to perform any past relevant work.  Tr. 601.

8.  The claimant was born in 1961 and was 53 years old, which is defined as closely approaching advanced age, on the date last insured.  Tr. 601.

9.  The claimant has at least a high school education and is able to communicate in English.  Tr. 601.

10. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.  Tr. 602.

11. Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant could have performed.  Tr. 602.

12. The claimant has not been under a disability, as defined in the Social Security Act, at any time from January 1, 2007, the alleged onset date, through March 31, 2014, the date last insured.  Tr. 603.

## V. Plaintiff's Arguments

Farley challenges the ALJ's decision on two grounds: the ALJ failed to give good reasons for the weight assigned to the opinion of treating physician Dr. Kabbara and the ALJ's RFC limitations regarding Farley's ability to stand and walk is not supported by substantial evidence. Doc. 15, pp. 14-22.

## VI. Legal Standard

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less

than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)). A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

## VII. Analysis

### A. The ALJ did not err with respect to Dr. Kabbara's opinion

Farley argues that the ALJ erred because she did not provide good reasons for the weight she assigned to treating physician Dr. Kabbara's opinion. Under the treating physician rule, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion well supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(c)(2). If an ALJ decides to give a treating source's opinion less than controlling weight, she must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight. *Wilson*, 378 F.3d at 544. In deciding the weight given, the ALJ must consider factors such as the length, nature, and extent of the treatment relationship; specialization of the physician; the supportability of the opinion; and the consistency of the opinion with the record as a whole. *See* 20 C.F.R. § 416.927(c); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 747 (6th Cir. 2007).

Farley argues that the ALJ erred because she only cited physical exam findings as a reason for assigning "little" weight to Dr. Kabbara's opinion. Doc. 15, p. 15. This is incorrect;

the ALJ also cited mild findings on diagnostic imaging.  Tr. 601.  Next, Farley argues that the

ALJ overlooked his May 2013 MRI that showed epidural lipomatosis in his lower back, causing

lumbar stenosis and thecal sac compression.  Doc. 15, p. 16.  But the ALJ discussed that Dr.

Goel diagnosed epidural lipomatosis in Farley's lumbar spine and performed an L4 and L5

laminectomy in May 2013 (Tr. 597); the ALJ did not err by not also referring to the underlying

MRI that diagnosed this condition.  Moreover, Dr. Kabbara's opinion was rendered in May 2012,

a year prior to his surgery; in May 2012, Farley had reported being stable on his medications and

his pain level had improved.  Thus, it was not error for the ALJ not to mention Farley's surgery

when discussing Dr. Kabbara's opinion.

Farley alleges that the ALJ erred when she did not refer to a January 2014 treatment note

from Dr. Kabbara.  Doc. 15, p. 16; Doc. 19, p. 3.  The Court disagrees.  The January 2014

treatment note does not provide support for Dr. Kabbara's March 2012 opinion.  Moreover, in

the treatment note, Dr. Kabbara stated that he explained to Farley that he has multilevel disc

bulges that "could" explain his persistent pain in his leg and arm.  Tr. 927.  But the ALJ

recognized that Farley had multilevel disc bulges and complained of radiating pain.  Tr. 594.  In

other words, the ALJ did not err by failing to recite a comment in a treatment note that

summarized Farley's condition when the ALJ recited the evidence detailing that condition.

Farley asserts that the ALJ erred because she failed to "explicitly consider any other of

the factors" such as specialization, length of treatment relationship, etc. when weighing Dr.

Kabbara's opinion.  Doc. 15, p. 16.  This argument fails.  First, an ALJ must consider the

enumerated factors in 20 C.F.R. § 416.927(c); she is not required to provide "an exhaustive

factor-by-factor analysis."  *Francis v. Comm'r of Soc. Sec.*, 414 Fed. App'x 802, 804 (6th Cir.

2011).  Next, elsewhere in her decision, the ALJ identified Dr. Kabbara as a pain management

specialist who started treating Farley in January 2012 and detailed the treatment he provided. Tr. 594. She recognized he continued to treat Farley until 2016. Tr. 600 (citing exhibits of treatment notes from Dr. Kabbara dated up to 2016). There is no requirement that the ALJ re-state these descriptions multiple times in a decision.

In short, the ALJ did not fail to provide good reasons when she assigned "little" weight to Dr. Kabbara's opinion.

### B. The ALJ's RFC finding that Farley can stand, walk and sit for 6 hours is not supported by the evidence cited by the ALJ

Farley argues that the ALJ's RFC limitations on standing, walking and sitting are not supported by the evidence. Doc. 15, pp. 18-21. The Court agrees that the ALJ's cited evidence does not support the limitations.

To evaluate a claimant's symptoms, including pain, a two-part analysis is used. 20 C.F.R. § 404.1529(a); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). First, the ALJ must determine whether the claimant has an underlying medically determinable impairment which could reasonably be expected to produce the claimant's symptoms. *Id.* Second, if such an impairment exists, then the ALJ must evaluate the intensity, persistence and limiting effects of the symptoms on the claimant's ability to work. *Id.* The ALJ should consider the following factors in evaluating a claimant's symptoms:

1) the individual's daily activities;
2) the location, duration, frequency, and intensity of the individual's pain or other symptoms;
3) factors that precipitate and aggravate the symptoms;
4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7)   any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id*.; *see also* 20 C.F.R. §§ 404.1529(c).  An ALJ's credibility assessment must be supported by substantial evidence, but "an ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility."  *Walters*, 127 F.3d at 531.  If the ALJ rejects a claimant's testimony as not being credible, the ALJ must state her reasons so as to make obvious to the individual and to any subsequent reviewers the weight given to the individual's statements and the reason for that weight.  *See Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005); Social Security Rule ("SSR") 96-7p, 1996 WL 374186, *2.

Here, the ALJ found that Farley's conditions reasonably would cause his difficulty with prolonged standing, walking and sitting (Tr. 598), but found that Farley was not as limited as he alleged.  Tr. 599.  The ALJ observed that objective exam findings showed normal range of motion, normal sensation and reflexes, and independent ambulation.  Tr. 598.  This was proper and the ALJ's analysis of Farley's objective evidence is supported by the record.

The ALJ also considered Farley's daily activities and history of treatment; as Farley contends, this is where the ALJ's decision lacks the support of substantial evidence of record. First, the ALJ states that Farley's activities of daily living (preparing simple foods, driving, light housekeeping, watching television, attending medical appointments, traveling to Pennsylvania once a year to visit relatives) indicates that he is not as physically limited as he alleged.  Tr. 599. But Farley alleged that he was able to walk, stand and/or sit for a total of four hours before needing to lie down, as the ALJ noted.  Tr. 593.  In other words, Farley's alleged daily activities are not inconsistent with his alleged limitations.  Therefore, his daily activities do not constitute substantial evidence undercutting his allegations that he cannot walk, stand, and/or sit more than

four hours a day because there is no evidence indicating that Farley spent more than four hours at a time doing any of these activities.

Additionally, the ALJ's consideration of Farley's treatment history is faulty. The ALJ acknowledged that Farley took strong pain medication, used steroids regularly, saw a pain management specialist and a neurologist, and had had two spinal surgeries, yet she characterized Farley's condition as "manageable" with "generally conservative treatment." Tr. 599. It is unclear from the ALJ's decision how strong pain medication which helped to a degree[4]; steroids; two surgeries, which helped to a degree; and a host of injections, which purportedly did not help, is "conservative" treatment. Moreover, the ALJ discredited Farley for not seeking "alternative treatment modalities such as acupuncture, physical therapy, chiropractic treatment, massage therapy, or use of a TENS unit." Tr. 599. But beyond a physical therapy referral for Farley's neck pain cited by the ALJ earlier in her decision (Tr. 597), the ALJ does not refer to evidence showing that Farley was advised to seek these alternative treatment modalities. This issue— whether alternative treatments were sought and, if not, why—is something that could have been developed at the hearing, in the absence of evidence in the record to support the ALJ's conclusion. Without more, however, the ALJ's bare assumption that Farley should have but did not take it upon himself to pursue alternative pain treatment measures is not supported by substantial evidence.

In short, the ALJ's finding with respect to Farley's daily activities is not supported by the evidence, and, with respect to Farley's treatment history, it is not sufficiently explained. Thus, the Court cannot conduct a meaningful review. The ALJ's decision must be remanded for

---

[4] See Tr. 594 (the ALJ describing increased doses of pain medication and tramadol for breakthrough pain which provided some relief)

further consideration.[5]

## VIII. Conclusion

For the reasons set forth herein, the Commissioner's decision is **REVERSED and REMANDED** for proceedings consistent with this opinion.

IT IS SO ORDERED.

Dated: July 22, 2019

*/s/ Kathleen B. Burke*
_____
Kathleen B. Burke
United States Magistrate Judge

---

[5] This opinion should not be construed as a recommendation that, on remand, the ALJ find Farley disabled.